UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                           :
UNITED STATES OF AMERICA,                                  :        05-CV-5240 (ARR) (SMG)
                                                           :
                    Plaintiff,                             :        OPINION & ORDER
                                                           :
        -against-                                          :
                                                           :
REAL PROPERTY AND PREMISES                                 :
KNOWN AS 90-23 201ST STREET, HOLLIS,                       :
NEW YORK, et al.,                                          :
                                                           :
                    Defendants in Rem.                     :
                                                           :
------------------------------------------------------------------ X

ROSS, United States District Judge:

        On November 16, 2005, the government filed an amended verified complaint in rem

against various properties seeking civil forfeiture pursuant to 21 U.S.C. § 881.  On December 16,

2005, claimant Ronald Young ("claimant" or "Young") filed a claim of interest in those

properties.  Although Young was represented at the time he filed his claim, he is currently

proceeding pro se in this action.  No other claim of interest has been filed in the properties, and

the time to do so has expired.  Presently before the court are cross-motions for summary

judgment by the government and claimant.  The central questions presented in these motions are

whether (i) certain evidence must be suppressed in this action under the Fourth Amendment to

the United States Constitution and (ii) the government has met its burden to demonstrate that the

properties at issue are subject to forfeiture.  For the reasons that follow, both motions are denied.

## BACKGROUND

        Young is a citizen of Jamaica.  Jan. 28, 2010 Deposition of Ronald Young ("Young

Depo."), Dkt. No. 89-1, at 10.  He is not, nor has he ever been, a citizen of the United States.  Id.

Young entered the United States in 1968 and subsequently obtained permanent resident status in

1972.  Id. at 9-11.  On May 6, 1987, in New York State Supreme Court, Young was convicted of

Criminal Possession of a Controlled Substance in the Third Degree in violation of New York

Penal Law § 220.16(1).  United States' Statement Pursuant to Local Rule 56.1 ("Gov't 56.1"),

Dkt. No. 83-2, Ex. E at 1.  Young was sentenced to one to three years in prison.  Id.  On April

12, 1989, the Immigration and Naturalization Service ("INS") commenced deportation

proceedings against Young, on the grounds that he was deportable pursuant to § 241(a)(11) of

the Immigration and Nationality Act as an alien who violated a law relating to a controlled

substance.  Id. at 2.  On September 26, 1989, Young conceded that he was deportable, and he

was ordered deported on February 1, 1990.  Id.  Young was deported to Jamaica on November 6,

1996.  Id.  Approximately four to six weeks following his deportation, Young illegally reentered

the United States.  Id.; Young Depo. at 13.  In February 2000, in New York State Supreme

Court, Young was convicted of Criminal Possession of Controlled Substance in the Seventh

Degree in violation of New York State Penal Law § 220.03.  Gov't 56.1 ¶ 14.  Because INS was

not aware of that arrest, no deportation proceedings were initiated against Young at that time.

Transcript of Hearing at 9, United States v. Young, No. 05-CR-846 (E.D.N.Y. June 8, 2006)

("June 8 Tr.").  On October 13, 2005, after receiving information that Young was in the country

illegally and engaged in unlawful activity, investigators operating as part of the United States

Marshal Service's Regional Fugitive Task Force ("Task Force") arrested defendant at his home

in Hollis, New York.  Id. Ex. B at 11; June 8 Tr. at 12.  That arrest gave rise to a criminal action

against Young and this civil forfeiture action.

I.      The Criminal Action

        In connection with his arrest on October 13, 2005, the government filed a criminal

complaint against Young in this court on November 16, 2005.  Gov't 56.1 Ex. B at 11.  That

complaint charged Young with illegal reentry into the United States in violation of 8 U.S.C.
§§ 1326(a),(b)(2). <u>Id.</u> On June 8, 2006, the court held a pre-trial hearing in the criminal action
to determine whether certain evidence should be suppressed from Young's trial.

At the hearing, Immigration and Customs Enforcement ("ICE") Special Agent Thomas
Kilbride testified before the court regarding Young's October 13, 2005 arrest. Kilbride is a
member of the Task Force, the primary responsibility of which is to locate and apprehend
fugitives. June 8 Tr. at 4. Kilbride testified that, in April 2005, he received information from a
New York City Police Department ("NYPD") sergeant, who had Young's son Richard Young
("Richard") in custody, that Young was in the United States illegally, trafficking narcotics, and
in possession of firearms. June 8 Tr. at 5. Subsequently, Kilbride obtained Young's
immigration file in May 2005. <u>Id.</u> at 6. The file included, among other things, photographs of
Young, his fingerprints, information about his initial entry into the United States and his
deportation, and a "rap sheet" listing his arrests and convictions. <u>Id.</u> at 6-7. Following a delay of
several months, in October 2005, the Task Force decided to apprehend Young and, if possible,
also to apprehend his son Richard, who at that time was a fugitive. <u>Id.</u> at 5.

At approximately 6 a.m. on the morning of October 13, 2005, Kilbride and six Task
Force agents – which included NYPD officers and ICE agents – went to the home of Young
located at 90-23 201st Street, Hollis, New York. <u>Id.</u> at 12; Gov't 56.1 Ex. L at 8. Kilbride
testified that he knew Young lived at that address because all but one of the arrests listed on
Young's rap sheet were associated with it and because Young's current, valid New York State
driver's license listed that address. June 8 Tr. at 12-13. On that morning, Kilbride brought with
him a picture of Young that was taken at the time of his 1999 arrest. <u>Id.</u> at 11. Kilbride also had
an arrest warrant for Young's son Richard with him, although Kilbride testified that he had no

probable cause or reasonable suspicion to believe that Richard was at that location at the time. Id. at 13-15. Kilbride did not have an arrest warrant for Young, even though the Task Force specifically went to Young's home to arrest him. Id. at 15.

Kilbride testified that, when the Task Force arrived at Young's home, three agents went to the front of the residence, two went to the back, and one went to each side. Id. The agents were armed. Id. at 113. He testified that the agents knocked on Young's door, but did not receive an immediate response to their knock. Id. at 15. The agents then "knocked" and "pounded" on all of the doors and on the windows for fifteen minutes, until Young finally answered the door. Id. at 16, 113. Kilbride testified that, when Young opened the door, Young stood on the inside of the dwelling directly across the threshold of the doorway from him. Id. at 110. Kilbride stood on the outside of the dwelling. Id. At that point, Kilbride stated to Young, "Police. What's your name?" Id. at 111. According to Kilbride, Young responded "Ronald Young." Id. Kilbride then stated to Young: "We need to come in and ask you some questions. Can we come in?" Id. at 17. Kilbride testified that Young "wasn't happy" about letting the police in, because it seemed like he was "annoyed" that they had awakened him. Id. at 112, 115. But Kilbride stated that Young "grudgingly" let the agents into his home. Id. at 17. Kilbride then took "one step into the living room on the other side of the threshold, in the inside of the building," where Young was standing right in front of him. Id. at 112-113. Kilbride testified that, once inside, he told Young that he was under arrest because he had been deported from the United States. Id. at 18, 114. Kilbride handcuffed Young and then sat him on his couch, "which is right inside the door." Id. The agents then conducted a security sweep of the house, during which they located Young's fourteen-year-old daughter upstairs. Id.

Kilbride testified that, following the security sweep, he informed Young of his Miranda

rights; Young waived his rights and agreed to talk to Kilbride. Id. at 18, 21-23. According to

Kilbride, Young then admitted that he was previously convicted of a drug offense and deported

from the United States. Id. at 18. Kilbride asked Young if he would consent to a search of his

residence and his three vehicles, which were located outside the home; Young agreed and signed

a consent-to-search form. Id. at 24; Gov't 56.1 Ex. K at 1.

Kilbride's official report related to Young's arrest states that the search of the home

yielded the following drugs and drug-related paraphernalia: approximately four ounces of

powdered cocaine; a white plastic bottle and plastic jar labeled "lactose";[1] approximately four

ounces of marijuana; two police scanners; a triple beam scale with cocaine residue; a digital

scale in a black leather case; eight plastic bags with smaller clear envelopes contained in the

bags. Gov't 56.1 Ex. L at 8-9. The search also yielded nine-thousand dollars in various cash

denominations found in Young's bedroom and seven-hundred dollars in various cash

denominations found in Young's wallet. Gov't 56.1 Ex. L at 8-9. That cash was subsequently

ion scan tested and found to contain high concentrations of cocaine. Gov't 56.1 ¶ 12. The

agents also seized a gold bracelet and four gold rings uncovered in the search of the home.

Gov't 56.1 Ex. Q at 174; June 8 Tr. at 25. The search of Young's cars did not yield any

contraband. Gov't 56.1 Ex. L at 8-9.

Kilbride's report also states that, following the search of his home, Young admitted that

he had been in the narcotics trafficking business since 1996 or 1997, had no source of income

other than narcotics trafficking, had not paid taxes or worked at a legitimate business since

reentering the country, bought his three vehicles with proceeds from narcotics trafficking, and

made the mortgage payments on his home with proceeds from narcotics trafficking. Id. at 9-10.

Subsequently, Young agreed to cooperate with agents and comply with their request to

---

[1] Kilbride's report states lactose is commonly used by narcotics traffickers to cut cocaine. Gov't 56.1 Ex. L at 9.

contact his cocaine supplier. June 8 Tr. 26-27. Young contacted his supplier by phone and asked him to bring a new supply of cocaine to Young's home. Id. Kilbride testified that he did not promise Young that he would not be prosecuted in exchange for his cooperation. Id. Young contacted his supplier by phone at approximately 9 a.m. Gov't 56.1 Ex. L at 10. At approximately 10:30 a.m., two individuals arrived at Young's home with seven ounces of cocaine. Id.; June 8 Tr. at 27. Both individuals were arrested by the agents. Id.

At the June 8, 2006 evidentiary hearing before this court, Young also testified regarding his arrest. He gave an account of the events of October 13, 2005 that differed greatly from Kilbride's testimony. Young testified that he was in his upstairs bathroom on that morning when he heard his front doorbell ring several times. June 8 Tr. at 88-89. He walked downstairs and observed three to four men standing outside his front door. Id. He then heard a man inside his house say "Don't move" and saw four men running through his kitchen with their guns drawn. Id. Young testified that the men had entered through the rear door of his home. Id. at 89-90. Young claimed that the men did not identify themselves. Id. at 91. He stated that one of them approached him and knocked him to the floor by punching him in the right side of the ribs. Id. at 91-92. Young testified that he was arrested on the ground between his dining room and living room. Id. at 88. He asserted that Kilbride was not the arresting officer and that Kilbride was not in the house when he was arrested. Id. at 92. Young claimed that, after he was arrested, the officers inside the home let in the officers at the front door, including Kilbride. Id. According to Young, the officers then searched his home without his consent. Id. at 93. Young claimed that, after the officers found the drugs in his home, Kilbride told him that he would not be charged with a drug crime if he signed the consent-to-search form; thus, Young signed the form. Id. at 93-94. Young further testified that Kilbride told him that he would not be arrested if he

cooperated by calling his drug supplier and asking him to deliver cocaine to the house. Id. at 94. Young therefore agreed to call his supplier. Id.

Following the testimony of the witnesses at the evidentiary hearing, the court noted the "vast discrepancy in terms of what happened." Id. at 117. Even accepting Kilbride's version of events, however, the court stated that it had "serious problems as to whether or not the government has met its burden of establishing voluntary consent to enter the house, when, very candidly, [Kilbride testified that the Task Force] went there to arrest him without a warrant." Id. at 118. The court further stated that, absent valid consent, under the Supreme Court's decision in Payton v. New York, 445 U.S. 573 (1980), it would be obligated to suppress all of the evidence obtained in the home as tainted by an illegal warrantless arrest. Id. at 119, 122-123.

At a pre-trial hearing the following week, on June 12, 2006, the court specifically found that the government had not met its burden to prove that Young voluntarily consented to the agents' entry into his house. Transcript of Hearing at 3, 7-8, United States v. Young, No. 05-CR-846 (E.D.N.Y. June 12, 2006) ("June 12 Tr."). The court stated that, under Payton, it would likely suppress "all of the evidence that came from the visit to the apartment on that day." Id. at 3. Nonetheless, the court stated that it would not suppress the prosecution of Young for illegal reentry. Id. Because the government possessed independent evidence of all the elements of that crime, the government did not need the evidence flowing from Young's arrest in order to proceed with its prosecution. Id. Following the court's ruling, in order to preserve certain unrelated legal issues for appeal, the parties agreed to conduct a bench trial based on stipulated facts. Id. at 2, 4-9.

On June 20, 2006, following the bench trial, the court found Young guilty of illegal reentry into the United States in violation of 8 U.S.C. §§ 1326(a),(b)(2). Gov't 56.1 Ex. F. On

April 19, 2007, the court sentenced Young to 84 months in prison. Transcript of Hearing at 15, United States v. Young, No. 05-CR-846 (E.D.N.Y. June 12, 2006) ("April 19 Tr."). In deciding to give Young a sentence enhancement for obstruction of justice, the court found that Young "willfully made a series of . . . false and perjurious statements to influence the outcome of his case." Id. at 12. In particular, the court found that Young made several false statements during the June 8, 2006 evidentiary hearing that warranted a sentence enhancement. Id. at 12. Among those statements, the court cited Young's assertions that "law enforcement authorities illegally entered his apartment by breaking through a glass door and that authorities coerced him to sign a consent to search form which he was not given an opportunity to read and proceeded to search his home illegally." Id. The court found those statements to be "willful lies." Id. In this regard, the court fully credited Kilbride's contrary testimony with respect to Young's arrest. Id. at 13. The court noted that Young's false statements had no impact on its decision to suppress evidence flowing from the agents' arrest of Young in violation of Payton. Id. at 14.

II.      The Civil Forfeiture Action

On November 8, 2005, the government filed a verified complaint in rem seeking civil forfeiture of Young's home and various property seized in and about the premises (collectively, the "defendant properties"). Dkt. No. 1. On November 16, 2005, the government amended its complaint to add additional information about the defendant properties. Amend. Compl., Dkt. No. 2. The defendant properties include: Real Property and Premises known as 90-23 201st Street, Hollis, New York (the "real property"); One 1999 Green Toyota Land Cruiser VIN # JT3HT05J1X0059990; One 1995 Grey Toyota Avalon VIN # 4T1GB11E4S0009963; One 1998 Grey Mercedes Convertible VIN # WBDKK47F7WF012199 (collectively, the "three vehicles"); One Men's Gold Bracelet; Four Men's Gold Rings (collectively, the "jewelry"); and

Approximately Nine Thousand, Seven Hundred Dollars ($9,700.00) in U.S. Currency (the "cash.")[2] Gov't 56.1 ¶ 1. The amended complaint alleges that, under 21 U.S.C. § 881, the defendant properties are subject to forfeiture because they were "each used or intended to be used to facilitate the commission of narcotics trafficking . . . and/or were purchased, acquired, and maintained after December 1996 with proceeds of narcotics trafficking . . . ." Amend. Compl. ¶ 3.

On December 16, 2005, Young filed the only claim of interest in the defendant properties. Dkt. No. 7. Young alleges that he is the proprietary owner of and has a complete possessory interest in the defendant properties, and he seeks restitution of those properties. Id.[3]

On January 28, 2010, Young testified at a deposition in the instant action. During his deposition, Young discussed his alleged sources of income. He testified that, prior to his deportation in 1996, he worked at a variety of different jobs. He claimed that he worked at a rake factory, a cab company, a car wash, and a truck company, each for several years. Young Depo. at 16-17, 20. Young asserted that, in 1987, he received a $50,000 insurance payment after he had a fire in his home. Id. at 52. Following that fire, Young stated that he began to buy used cars with the insurance money, repair them, and sell them for a profit. Id. at 72. He claimed that he would make up to $150 per car through this business, which he testified he engaged in from 1987 until his arrest in 2005. Id. at 72, 78. Young claimed that it could take up to two to three months to sell one car. Id. at 77. After he was deported, Young testified that he began to rent out the basement of his home at a rate of $500 per month, although it is unclear from his testimony if he had continuous tenants. Id. at 60. Young asserted that he never earned more

[2] By Order dated February 23, 2010, this court granted the government's motion for an interlocutory sale of the real property and the three vehicles pending resolution of this civil forfeiture action. Dkt. No. 71.
[3] By consent of the parties, on March 24, 2006, the court stayed the civil action pending final resolution of Young's appeal in his criminal action. Dkt. No. 16. On January 5, 2009, Young's case reached final resolution when he decided not to seek a writ of certiorari from the United States Supreme Court. Dkt. No. 26.

than $10,000 per year during his entire time in the United States.  Id. at 70.  He stated that he filed tax returns in the 1980s, but he has not filed tax returns since he was deported in 1996.  Id. Young testified that he has not had a bank account since the 1970s, that he has never had any credit cards, and that he always conducted financial transactions in cash.  Id. at 47, 49, 70.  He asserted that the largest amount of cash that he has ever had in his possession is $10,000.  Id. at 51.  Young denied that he has ever made any money by selling drugs.  Id. at 49-50, 71.

Young also testified regarding his purchase of the defendant properties.  Young stated that, in 1981, he took over the mortgage of the real property from the owner by making a cash down payment of $10,000 or $12,000.  Id. at 57-58.  Young paid most of the down payment himself, but his wife paid a small portion as well.  Id. at 58.  He asserted that he owed $51,000 on the mortgage when he bought the house.  Id. at 76.  Young testified that he made monthly mortgage, insurance, and utility payments for the real property; he claimed those payments totaled approximately $300 per month.  Id. at 60-61.  He stated that those payments and food costs were his only expenses.  Id. at 90.  With respect to the three vehicles, Young claimed that he purchased the 1995 Toyota Avalon for $2,000 or $2,500, the 1998 Mercedes Convertible for $7,000, and the 1999 Toyota Land Cruiser for approximately $10,000.  Id. at 51-53.  Young testified that he saved the money from his insurance payment to buy the cars, and he claimed that he purchased those cars in order to repair them and sell them for a profit.  Id. at 51-52.  With respect to the jewelry, Young stated that he bought the bracelet at a pawn shop and that the four gold rings were given to him as gifts.  Id. at 55-57.  Young did not testify as to how much he paid for the bracelet.  With respect to the cash, Young did not testify as to how he acquired it.

In support of its motion for summary judgment in this action, the government has submitted various documents regarding the defendant properties.  With respect to the real

property, the government has submitted mortgage documents showing that, as of November 2004, the monthly mortgage payments were approximately $596 per month and the outstanding principal on the mortgage was approximately $12,940.  Gov't 56.1 Ex. O at 74.  The government has also submitted documents showing that the quarterly taxes on the real property for the years 2005-2006 were approximately $483.  Gov't 56.1 Ex. O at 115.  In November 2005, the government had the real property appraised, and it was valued, exclusive of liens or encumbrances, at approximately $400,000.  Id. Ex O at ECF 56.[4]  Regarding the three vehicles, the government has submitted the certificate of title to each vehicle, all of which are in Young's name.  Id. Ex. P at 85, 87, 89.  The certificates of title issued for the 1995 Toyota Avalon in December 2004, for the 1998 Mercedes Convertible in May 2002, and for the 1999 Toyota Land Cruiser in May 2004.  Id.  The bill of sale for the Land Cruiser indicates that Young purchased the car for $12,000 in May 2001.  Id. Ex. P at 90.  He made a $5,000 cash down payment on April 29, 2001, and then he made subsequent cash payments of $5,000 on May 18, 2001 and $2,000 on May 31, 2001.  Id.[5]  The government contends that, in March 2009, the Kelly Blue Book retail values of the vehicles were $5,300 for the Avalon, $10,000 for the Mercedes, and $17,000 for the Land Cruiser; thus, the total Kelly Blue Book retail value of the cars was $32,300.  Id. Ex. P at ECF 2.  Finally, with respect to the jewelry, the government had each item appraised in October 2005, and it contends that the jewelry has a total value of approximately $5,000.  Id. Ex. Q.  Thus, the government asserts that, as of November 2005, the real property, the three vehicles, the cash, and the jewelry had a total value of approximately $446,000.

In addition to the documents submitted regarding the defendant properties, the

---

[4] In the government's exhibits submitted in support of its motion, certain pages are unnumbered.  Where the court references those pages, they are referred to by the page number assigned by the Electronic Case Filing ("ECF") system.

[5] The record does not indicate why Young's certificate of title to the Land Cruiser did not issue until three years after he purchased it.

government also has submitted Young's answers to various discovery requests made to him in the course of this action.  Gov't 56.1 Ex. R.  In particular, the government points the discovery request that stated:  "Complete and sign the attached IRS Request for Transcript of Tax Return (IRS Form 4506-T) and Tax Authorization (IRS Form 8821).  These forms are to be returned with your responses to the above interrogatories and document demands within thirty days."  Id. Ex. R at ECF 26-27.  In response to that request, Young stated: "I choose not to answer this interrogatory on the ground that said answer may incriminate me.  I, therefore, plead the fifth amendment protection against self-incrimination."  Id. at ECF 15.

III.     The Instant Motion

Presently before the court are cross-motions for summary judgment by the government and Young.  The government argues that, based upon the evidence seized at Young's home following his October 13, 2005 arrest, and the additional evidence submitted in this civil forfeiture action, the government has met its burden to establish that the defendant properties are subject to forfeiture.  Further, the government argues that, even if the evidence flowing from Young's arrest must be suppressed in this action, the additional evidence it has submitted in this action is sufficient to satisfy its burden.  In response, Young contends that the evidence flowing from his arrest must be suppressed in this action, and he asserts that the government cannot meet its burden in this case without that evidence.

For the reasons set forth below, the cross-motions for summary judgment are denied. The court holds that: (i) Young's October 13, 2005 arrest violated the Fourth Amendment to the United States Constitution, (ii) under the exclusionary rule, all evidence that is the fruit of Young's illegal arrest must be suppressed in this action, and (iii) considering only the admissible evidence, there is a genuine issue of material fact as to whether the government has met its

burden to show that the defendant properties are subject to forfeiture.

## DISCUSSION

I.      Summary Judgment Standard

A moving party deserves summary judgment if, "upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993) (citations omitted); see Fed. R. Civ. P. 56(c).  The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. See Anderson v. Liberty, 477 U.S. 242, 249 (1986).  In addressing a motion for summary judgment, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought."  Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989) (citations omitted).  Summary judgment should be granted "[o]nly when no reasonable trier of fact could find in favor of the non-moving party . . . ."  Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992) (citation omitted).  The moving party bears the initial burden of demonstrating that no genuine factual dispute exists.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  If the movant successfully shoulders its initial burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 250 (internal quotation marks omitted).

II.     Fourth Amendment Violation

The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As the Supreme Court has stated, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton, 445 U.S. at 585 (citation and internal quotation marks omitted). The Court has "long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort." Id. at 586. Thus, while "the warrantless arrest of an individual in a public place upon probable cause [does] not violate the Fourth Amendment," United States v. Santana, 427 U.S. 38, 42 (1976), "[i]t is a basic principle of Fourth Amendment law that . . . seizures inside a home without a warrant are presumptively unreasonable," Payton, 445 U.S. at 586 (internal quotation marks omitted). "To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." Id. at 589. Thus, absent exigent circumstances or consent, the Fourth Amendment prohibits law enforcement agents from making a warrantless entry into a suspect's home in order to make an arrest. Id. at 576, 590.

In this case, Kilbride testified that – after Young answered his door in response to the agents' knocking – he made a warrantless arrest of Young "one step" inside his doorway.[6] Kilbride's testimony does not suggest that exigent circumstances justified his entrance into Young's home. See United States v. Loria, 306 F.3d 1271, 1284 (2d Cir. 2002) (articulating factors to determine whether exigent circumstances exist). Thus, based on Kilbride's testimony, the court must decide two issues to determine whether Young's arrest violated the Fourth Amendment (i) whether Young voluntarily consented to the agents' entry into his home and (ii) if he did not, whether the agents were required to have a warrant to arrest Young one step

---

[6] The court adheres to the credibility determination it made at Young's April 2007 sentencing. Young's testimony at the June 8, 2006 hearing regarding his arrest was not credible. The court fully credits Kilbride's contrary testimony.

inside his doorway, after Young opened his door in response to the agents' knocking.

At the June 2006 hearings in Young's criminal case, this court expressed concern and ultimately held that Young's warrantless arrest violated the Fourth Amendment. The court reaffirms that holding here. The court finds that Young did not voluntarily consent to the agents' entry into his home and that the agents were required to have a warrant to arrest Young. Accordingly, the agents' warrantless arrest of Young violated the Fourth Amendment.

A.    *Consent*

The government bears the burden of proving by a preponderance of the evidence that an individual's consent to enter or search a residence was voluntary. United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir.). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). A finding of consent requires proof of more than "mere acquiescence in a show of authority," United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993), but the consent "need not be expressed in a particular form"; it "can be found from an individual's words, acts or conduct." United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993) (internal quotation marks and citation omitted). Consent is involuntary if it is exacted from explicit or implicit coercion caused by implied threat or covert force. See United States v. Snype, 441 F.3d 119, 131 (2d Cir. 2006). The court must apply an objective standard when evaluating the voluntariness of consent. United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995). "[A] court must ask, 'what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. Santos, 303 F.Supp.2d 333, 335 (S.D.N.Y. 2003) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

Coercive surroundings created by law enforcement can render a suspect's consent to entry involuntary. See Snype, 441 F.3d at 131; 4 Wayne R. LaFave, Search and Seizure, § 8.2(b) (4th ed. 2004). Various factors can contribute to a finding that law enforcement created coercive surroundings. See LaFave at § 8.2(b). For example, "[i]t is significant . . . [if] consent has been obtained while the consenting party was confronted by many police officers. The presence of a number of policemen is likely to suggest that the police are contemplating an undertaking which does not depend upon the cooperation of the individual from whom permission . . . is being sought." Id. (footnotes omitted). Additionally, an attempt by law enforcement to enter a home at an unusually late or early hour may contribute to a finding of coercion. See id. Likewise, coercion may be present if law enforcement agents persist in attempting to gain entry in the face of a suspect's refusal to consent. United States v. Jerez, 108 F.3d 684, 690-92 (7th Cir. 1997). "While it is unlikely that a single coercive element will, standing alone, be enough to invalidate consent, several of them in combination certainly will." LaFave at § 8.2(b).

In short, when faced with coercive surroundings created by law enforcement, if a suspect grants entry "in submission to authority rather than as an understanding and intentional waiver of a constitutional right," then his consent is involuntary. United States v. Jones, 641 F.2d 425, 429 (6th Cir. 1981) (finding consent involuntary where five armed officers banged and kicked the door "very hard" and demanded that it be opened); see, e.g., United States v. Crespo, 834 F.2d 267, 269-270 (2d Cir. 1987) (consent invalid where agents displayed weapons and kicked the door); Jerez, 108 F.3d at 690-92 (finding occupants failure to answer door after three minutes of knocking by police late at night constituted refusal to consent; where police continued to knock, until occupants finally opened door, occupants did not consensually answer door since a "reasonable person in their situation could conclude only that the deputies would not leave unless

the door was opened"); United States v. Marshall, 488 F.2d 1169, 1189 (9th Cir. 1973) (finding

consent invalid where several agents stood at door with guns drawn); United States v. Tibbs, 49

F. Supp. 2d 47, 52-54 (D. Mass. 1999) (concluding that the late hour and large number of

officers invalidated consent).

Here, the court finds that the government has failed to meet its burden of demonstrating

that Young voluntarily consented to the police entry into his home. On the morning of October

13, 2005, seven armed agents went to Young's residence at 6 a.m. to arrest him. The number of

armed agents who went to Young's residence, coupled with the very early morning hour at

which they approached, created an environment that was implicitly coercive. When the agents

surrounded the home upon arrival and began "knocking" and "pounding" on all the doors and the

windows, they intensified that coercion. Young's failure to answer the door for several minutes

in response to agents "pounding" and "knocking" constituted a refusal to admit the agents. The

agents persisted for fifteen minutes in the face of Young's refusal. Under such circumstances, he

could reasonably have concluded that the agents would not leave unless the door was opened.

After opening the door, Young was faced with three armed agents at his front door demanding

entry into his home, at which point he "grudgingly" allowed them to enter, even though he was

"annoyed" and "unhappy" about their presence. Given these circumstances, a reasonable person

would understand Young's consent to entry to be submission to authority, not a voluntary waiver

of his constitutional rights. Thus, the court finds Young's consent invalid.

> B.       *The Warrant Requirement for Doorway Arrests*

Because Young did not voluntarily consent to the agents' entry into his home, the

relevant question becomes whether the agents needed a warrant to arrest Young "one step" inside

his doorway, after Young opened his door in response to their knocking. The issue of whether a

suspect who opens his door in response to a law enforcement agent's knock may be arrested

without a warrant, absent exigent circumstances, is in great dispute among the federal courts.

See Breitbard v. Mitchell, 390 F.Supp.2d 237, 248 & 248 n.4 (E.D.N.Y. 2005) (collecting cases).

The disagreement centers on whether the Supreme Court's decision in Payton or its decision in

Santana governs the warrant requirement for such doorway arrests.  The Second Circuit has yet

to take a position on this issue; indeed, it has specifically reserved the question of "whether a

defendant loses the protection of [Payton] merely by opening his door in response to a knock by

unidentified police officers."  United States v. Bedell, 311 Fed. Appx. 461, 464 (2d Cir. 2009)

(citing United States v. Gori, 230 F.3d 44, 52 n.4 (2d Cir. 2000)).  Nonetheless, the Second

Circuit's decisions interpreting Payton and Santana provide some guidance on this issue.  After

reviewing those cases, this court concludes that Young's warrantless arrest violated the Fourth

Amendment.

      The conflict between Payton and Santana derives from the intersection of two previously-

discussed Fourth Amendment principles.  First, if law enforcement officers have probable cause,

they may constitutionally arrest an individual in a public place without a warrant.  Santana, 427

U.S. at 42.  Second, absent consent or exigent circumstances, law enforcement officers may not

constitutionally enter a home without a warrant to arrest an individual, even if they have

probable cause.  Payton, 445 U.S. at 585-590.  "What distinguishes these two [principles] is that

the latter involves an entry . . . into the home, a place where individuals enjoy an especially

heightened Fourth Amendment protection . . . . The former does not."  Sparing v. Vill. of

Olympia Fields, 266 F.3d 684, 688 (7th Cir. 2001) (internal citations omitted).  "At first blush,

then, the lines appear clear.  Intrusion into the home without a warrant 'by even a fraction of an

inch' is too much."  Id. (quoting Kyllo v. United States, 533 U.S. 27, 37 (2001).  "The lines are

not so clear, however, because exactly where outside ends and where the home begins is not a point immediately obvious." Id. Consequently, at the doorway of a home, where the public domain meets the private residence, it is unclear which of the two principles governs. In particular, must law enforcement officers have a warrant to arrest a suspect who is inside his home, but standing in front of an open doorway?

Payton and Santana seemingly provide two different answers to that question. Under Payton, a warrant is required to effectuate such a doorway arrest. The Supreme Court stated in that case that nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." 445 U.S. at 589. Thus, it held that "the Fourth Amendment has drawn a firm line at the entrance to the house." 445 U.S. at 590. "Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id. By contrast, Santana does not seem to require a warrant to arrest a suspect standing inside his doorway. In Santana, the Supreme Court held that a suspect who was standing directly in her doorway – such that "one step forward would have put her outside, one step backward would have put her in the vestibule of her residence" – was in public. 427 U.S. at 40 n.1 & 42. The Court found that the suspect "was not in an area where she had any expectation of privacy." Id. at 42. "She was not merely visible to the public but was exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." Id. (citation omitted). The Court held: "What a person knowingly exposes to the public, even in his own house or office, is not a subject of Fourth Amendment protection." Id. (citation omitted).

The Second Circuit has addressed the conflict between Payton and Santana in the context of several doorway arrests that occurred under varying circumstances. In Crespo, the court found that Payton required a warrant for the arrest of a suspect who partially opened his door in

response to a police informant's knock.  In that case, four DEA agents accompanied an informant to the apartment of a suspect.  Id. at 269.  The police did not have an arrest warrant for the suspect.  Id.  The agents instructed the informant to knock on the suspect's door, while the agents concealed themselves down the hallway.  Id.  The suspect partially opened the door in response to the informant's knock, and they engaged in a conversation, during which the suspect threatened the informant.  Id.  After hearing the threat, the agents approached the suspect's door. Id.  As they approached, the suspect "either slammed the door shut when he saw them or already had closed the door and retreated into his apartment."  Id.  The agents then obtained entrance into the apartment without the suspect's voluntary consent and arrested him.  Id. at 269-270.  On appeal, the government argued that, under Santana, the agents were not required to have an arrest warrant to enter the apartment.  Id. at 270.  It claimed that the suspect's arrest was "actually set in motion in a public place," since the suspect opened his door in response to the informant's knock.  Id.  The court rejected that argument.  It found that, unlike in Santana, the suspect was not standing in the doorway exposed to "public view, speech, hearing, and touch as if [he] had been completely outside [his] house."  Id. (quoting Santana, 427 U.S. at 42).  Rather, it appeared that, when the suspect spoke to the informant, "the door to the apartment was at most half-opened and, indeed, even that degree of exposure was induced by DEA agents who were seeking to flush [the suspect] out."  Id.  Under such circumstances, absent exigent circumstances, Payton prohibited entry into the home without a warrant.  Id.[7]

By contrast, in Gori, the Second Circuit applied Santana and found that no warrant was required to seize suspects who voluntarily opened their door in response to an invitee's knock. There, two police officers set up surveillance of an apartment to which they knew drugs had been

---

[7] The court found such exigent circumstances existed in that case and held the warrantless arrest constitutional.  Id. at 271.

delivered.  <u>Id.</u> at 47.  They did not have an arrest warrant for the apartment's occupants.  <u>Id.</u> at 48-49.  During their surveillance, a delivery woman sought to deliver food to the apartment.  <u>Id.</u> at 47.  The police officers accompanied the delivery woman to the apartment door.  <u>Id.</u>  The officers stood to either side of the door while the delivery woman knocked; in response, "the door was opened wide."  <u>Id.</u>  Both officers displayed their shields, and ordered the occupants of the apartment out into the hallway, where they were not free to leave.  <u>Id.</u>  After finding that the officers constructively entered the apartment and seized the occupants when they ordered them into the hallway, the court held that such a warrantless seizure was permissible under <u>Santana</u>. <u>Id.</u> at 49-50.  The court stated that the "facts critical to its analysis [were] that the interior of [apartment] was exposed to public view when the door was voluntarily opened."  <u>Id.</u> at 52. "[T]he principle of <u>Santana</u> . . . is that the warrant requirement depends on the suspect's actual expectation of privacy."  <u>Id.</u> at 53-54.  "No one in a place opened to public view can expect privacy in that place and at that time, whether the suspect is on the threshold, in a vestibule or at the far end of an exposed interior room."  <u>Id.</u> at 54. "Once the apartment was opened to public view by the defendant in response to the knock of an invitee, there was no expectation of privacy as to what could be seen from the hall."  <u>Id.</u> at 53.  "The officers therefore needed no warrant to temporarily 'seize' the occupants and conduct a limited investigation . . . ."  <u>Id.</u>  <u>Payton</u>, the court concluded, did not govern under such circumstances.  <u>Id.</u> at 52.

In so holding, the Second Circuit for the first time reserved the question at issue in this case by specifically distinguishing the knock of a police officer from the knock of an invitee. The court stated: "Because the defendants opened the door in response to the knock initiated by someone whom they invited – not by the police or someone acting as a subterfuge for the police – we need not consider whether a suspect loses the heightened protection of <u>Payton</u> merely by

opening a door in response to a knock by law enforcement." Id. at 52 n. 4 (citations omitted).

Two years after Gori, in Loria, the Second Circuit again addressed the conflict between Payton and Santana. In that case, two police officers approached the open side door of a house to investigate a noise complaint. Id. at 1276. They did not have a warrant for the arrest of any of the individuals in the home. Id. at 1277. The officers began speaking with an individual inside the home about the complaint, and they requested that the owner of the home come outside to discuss the problem. Id. at 1276. Loria, the owner, did not want to speak to the officers, and he approached the door and attempted to close it. Id. To prevent the door from closing, one of the officers stuck out his arm and leaned into the door, knocking Loria backwards. Id. at 1277. The officer then took one or two steps into the foyer, grabbed Loria, pulled him outside, and forcefully arrested him. Id. Stating that "[n]o invasion of the sanctity of the home can be dismissed as de minimis," the court held that Payton controlled; thus the officer's warrantless entry into the home was unconstitutional. Id. at 1284. In denying the officer qualified immunity for the constitutional violation, the court found that no circumstances were present that would lead a reasonable officer to believe that the principle articulated in Santana governed this case. Id. at 1286. "Loria was not in the doorway. Rather, he was at least a door's width inside the house when he attempted to close door." Id. (citations omitted). "At no point was Loria 'as exposed to public view, speech, hearing, and touch as if [he] had been standing completely outside [his] house.'" Id. (quoting Santana, 427 U.S. at 42). "Indeed, he was attempting to limit his exposure to public view when he was arrested." Id. (citations omitted). The court therefore held "that under the circumstances no reasonable officer could have concluded that – simply because Loria was near the door – taking two steps into the house and seizing Loria inside did not constitute a Fourth Amendment entry." Id. (citations omitted).

The Second Circuit's decisions in Crespo, Gori, and Loria demonstrate that Payton applies to doorway arrests, except in the limited circumstances in which an individual voluntarily opens his door in such a manner that he exposes himself to public view, speech, hearing, and touch as if he is standing completely outside his home. In Crespo, the occupant opened his door in response to the knock of an uninvited police informant, and he attempted to shield himself from public view. The occupant in Loria actively attempted to close the door in response to the police officers' approach while standing several feet away from his door. In both cases, the Second Circuit enforced the firm line that Payton drew at the entrance to the house. Conversely, in Gori, the occupants voluntarily opened their door widely in response to an invitee's knock. After noting that the critical factors in its decision were that the occupants voluntarily exposed the apartment to public view, the Second Circuit found that Santana applied to that doorway arrest. Gori is distinguishable from Crespo and Loria based on the fact that the occupant of the dwelling in Gori voluntarily exposed himself to public view, while the occupants in Crespo and Loria did not. Thus, following the above-discussed Second Circuit precedent, a warrantless doorway arrest is permissible under Santana only where an individual voluntarily opens his door and exposes himself to the public. Absent such circumstances, under Payton, a warrant is required to arrest someone who stands inside the doorway of his home.

Accordingly, the question first reserved by the Second Circuit in Gori – whether an individual loses the protection of Payton merely by opening the door to his home in response to a knock by law enforcement officers – turns on whether the individual has voluntarily opened his door and exposed himself to the public. The court notes that it is unclear whether an individual's decision to open the door to his home in response to a law enforcement agent's knock can ever truly be voluntarily. As the Second Circuit stated in dicta in United States v. Reed, 572 F.2d 412

(2d Cir. 1978),

> We do not believe that the fact that the [occupant] opened the door to her
> apartment in response to the knock of three armed federal agents operated in such
> a way as to eradicate her Fourth Amendment privacy interest . . . . To hold
> otherwise would be to present the occupants with an unfair dilemma, to say the
> least – either open the door and thereby forfeit cherished privacy interests or
> refuse to open the door and thereby run the risk of creating the appearance of an
> "exigency" sufficient to justify forcible entry. This would hardly seem fair in
> situations that present no exigent circumstances.

Id. at 423 n.9 (internal citations omitted). If an individual's decision to open his door in response

to a law enforcement agent's knock is per se involuntary, then Payton will always control in such

circumstances. Courts addressing this issue have split over whether a warrant is necessarily

required when an individual opens the door to his home in response a law enforcement agent's

knock. Compare, e.g., Hadley v. Williams, 368 F.3d 747, 750 (7th Cir. 2004) (finding decisions

in other circuits applying Santana to doorway arrests "inconsistent with the spirit of Payton,"

because "few people will refuse to open the door to police") and United States v. McGraw, 920

F.2d 224, 229 n.5 (4th Cir. 1990) (finding occupant's presence at the doorway "not completely

voluntary" because he came to the door in response to the knocking of law enforcement agents)

with McKinnon v. Carr, 103 F.3d 934, 935-936 (10th Cir. 1996) (where "officers had knocked,

identified themselves, neither displayed nor threatened violence, and [occupant] had opened the

door," under Santana, warrantless doorway arrest was constitutional) and United States v.

Vaneaton, 49 F.3d 1423, 1427 (9th Cir. 1995) (upholding warrantless doorway arrest where

occupant opened door in response to police knocking).

In this case, however, the court need not resolve the issue of whether an individual's

decision to open his door in response to a law enforcement agent's knock is per se involuntary.

Here, Young clearly did not voluntarily open his door to the Task Force agents. As discussed

above with respect to the involuntariness of Young's consent, Young opened his door in

response to coercion by the agents who had surrounded his home.  For the same reasons discussed there, the court finds that Young did not voluntarily open his door.  <u>Payton</u> therefore governs this case.  <u>See</u>, <u>e.g.</u>, <u>Loria</u>, 306 F.3d at 1286; <u>Crespo</u>, 834 F.2d at 270; <u>United States v. Al-Azzawy</u>, 784 F.2d 890, 893 (9th Cir. 1985) (warrant required under <u>Payton</u> where suspect "only emerged under circumstances of extreme coercion"); <u>United States v. Morgan</u>, 743 F.2d 1158, 1166 (6th Cir. 1984) (warrant required under <u>Payton</u> where defendant's exposure to public view was result of "coercive police behavior"); <u>Breitbard</u>, 390 F.Supp.2d at 248 (<u>Santana</u> inapplicable where occupant "only opened her door after the police officers announced their presence and falsely informed her that they had a warrant.").  Because Kilbride crossed the firm line established in <u>Payton</u> when he arrested Young without a warrant "one-step" inside his home, Young's arrest violated the Fourth Amendment.

III.     <u>The Exclusionary Rule</u>

Because the warrantless arrest of Young violated the Fourth Amendment, the court must determine whether the evidence flowing directly from that unlawful arrest must be suppressed in this action under the exclusionary rule.  The government argues that Young's illegal arrest does "not bar this civil forfeiture action against the Defendant Properties," because (i) "it is well established in the Second Circuit that even when the initial seizure is found to be illegal, the seized property can still be forfeited" and (ii) the government may "use evidence gathered after the filing of civil forfeiture complaint to meet its burden . . . ."  United States' Memorandum of Law in Support of its Motion for Summary Judgment and Request for Entry of a Decree of Forfeiture, Dkt. No. 83-6, at 30.  Thus, the government contends that none of the evidence seized from Young's home should be suppressed.  <u>Id.</u> at 29.  In response, Young asserts "that the court should exclude all information from the illegal search as fruit of the poisonous tree, because the

agents would not have learned of any of the information but for the illegal seizure." Claimant's Traverse in Reply to the Government's Motion for Summary Judgment and Request for a Degree of Forfeiture, Dkt. No. 85, at 10-11. The court agrees with Young.

The government is correct that Young's illegal arrest does not bar this civil forfeiture action against the defendant properties and that evidence obtained after the filing of the action may be utilized to meet its burden; however, the exclusionary rule does apply in this action, and it bars from admission all evidence flowing directly from Young's illegal arrest. In One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965), the Supreme Court specifically held that the exclusionary rule is applicable in civil forfeiture actions and thus evidence resulting from a Fourth Amendment violation must be barred from such actions. Id. at 696. The Second Circuit's "exposition of that holding remains, however, somewhat unclear." United States v. $557,933.89, More or less, in United States Funds, 287 F.3d 66, 80 (2d Cir. 2002). Its decisions interpreting Sedan have suggested that – while the exclusionary rule is applicable in civil forfeiture actions – the property subject to forfeiture cannot be suppressed. $557,933.89, 287 F.3d at 80. In $557,933.89, the Second Circuit explained the ambiguity in its precedent:

> In United States v. $ 37,780 in U.S. Currency, 920 F.2d 159 (2d Cir. 1990), we stated that "an illegal seizure of property does not immunize that property from forfeiture, *that the property itself cannot be excluded from the forfeiture action*, and that evidence obtained independent of the illegal seizure may be used in the forfeiture action." Id. at 163 (emphasis added). The meaning of the italicized portion of this statement is somewhat unclear. Other courts of appeals and commentators have understood it to mean that the defendant property must also be admitted *for its evidentiary value* in forfeiture proceedings regardless of the propriety of its initial seizure -- and, so interpreted, these courts and commentators have generally been critical of that principle. See United States v. $191,910.00 in U.S. Currency, 16 F.3d 1051, 1064 & n.27 (9th Cir. 1994) (disagreeing with $37,780 and noting that "majority" of circuits do likewise); 1 Wayne R. LaFave, Search and Seizure § 1.7(a) n.10 (3d ed. 1996) ("Despite some authority to the contrary [i.e., $37,780], it does not follow that the res in a forfeiture proceeding, if itself illegally seized, can also be admitted for its evidentiary value."). This circuit has not expounded further on the meaning of

that statement, so its precise meaning -- indeed, even its status as a holding -- and its application to this case is unclear.

287 F.3d at 80 (alteration in original). In the absence of clear direction from the Second Circuit, this court declines to hold, contrary to the weight of authority, that the property subject to forfeiture in this case that was discovered as a result of the illegal arrest is admissible for its evidentiary value. The court therefore applies the exclusionary rule to bar all evidence flowing directly from Young's illegal arrest.

Turning to the specific evidence at issue in this case, the court notes that:

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search. Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

United States v. Isiofia, No. 02 Crim. 520 (HB), 2003 U.S. Dist. LEXIS 7542, at *16-*17 (S.D.N.Y. May 5, 2003) (citing Murray v. United States, 487 U.S. 533, 537-38 (1988)). Here, to begin with, "any evidence found, or statements taken, inside the home" may not be admitted as evidence. See New York v. Harris, 495 U.S. 14, 20 (1990). Specifically, the following must be suppressed: all drugs and drug-related paraphernalia, the cash (including the ion test results), the jewelry (including the government's appraisal of its value), Young's statements and any other evidence related to the drug-suppliers who Young called at the request of the agents, and all other statements made by Young to the agents inside his home. Moreover, the agents' official reports related to Young's arrest, which discuss the suppressed evidence and statements, are inadmissible. Likewise, Young's deposition testimony in this case related to the suppressed evidence or statements is inadmissible. As the government has independent evidence establishing Young's ownership of the real property and the three vehicles, those properties are

admissible as evidence in this case.  <u>See</u> Gov't Exs. O & P.  Other evidence submitted by the government that is not the fruit of the illegal arrest is also admissible.

IV.    <u>Forfeiture of the Defendant Properties</u>

The government contends that, even without the evidence suppressed under the exclusionary rule, it has met its burden to show that the defendant properties are subject to forfeiture.  The government seeks forfeiture of the defendant properties under two different theories.  First, the government asserts that the real property is forfeitable under 21 U.S.C. § 881(a)(7) because it was used to facilitate narcotics activity.  Second, it asserts that all the defendant properties – the real property, three vehicles, cash, and jewelry – are subject to forfeiture under 21 U.S.C. § 881(a)(6) because they were obtained in exchange for drugs or maintained or obtained with the proceeds of narcotics activity.[8]  The government asserts that it has submitted sufficient admissible evidence to establish both theories as a matter of law.  The court disagrees.

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the government must "establish, by a preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. § 983(c)(1).  CAFRA also provides that when "the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was

---

[8] 21 U.S.C. §§ 881(a)(6)-(7) state:

  (a) Subject property.  The following shall be subject to forfeiture to the United States and no property right shall exist in them:

  . . .

    (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this title, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this title.

    (7) All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvement, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment.

involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). Therefore, to prove its first theory, the government must show a substantial connection between the real property and narcotics activity. Moreover, "[w]hen the Government seeks forfeiture, pursuant to 21 U.S.C. § 881(a)(6), on a theory that property constitutes proceeds traceable to an exchange for narcotics, . . . [it must prove] generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking." United States v. United States Currency in the Sum $ 185,000 more or less, 455 F.Supp.2d 145, 149 (E.D.N.Y. 2006) (citation omitted). So, to prove its second theory as well, the government must show a substantial connection between the defendant properties and narcotics activity. Considering the admissible evidence, there is a genuine issue of material fact as to whether the government has met its burden to establish the requisite substantial connection to narcotics activity under both of its theories.

Young's narcotics-related convictions in New York State court in 1987 and 2000 are the only admissible evidence in the record that directly connects Young to narcotics activity. "The government may rely upon a claimant's narcotics conviction, as one factor, to meet its burden of establishing the requisite connection between funds and drug activity." United States v. United States Currency in the Amount of $248,430, No. 01-CV-5036(SJF)(ASC), 2004 U.S. Dist LEXIS 7072, at *12 (E.D.N.Y. April 14, 2004) (citing $557,933.89, 287 F.3d at 88). Standing alone, however, the court finds Young's convictions insufficient to establish, as a matter of law, the requisite connection by a preponderance of the evidence. See United States v. $21,000 in United States Postal Money Orders, 298 F. Supp. 2d 597, 603 (E.D. Mich. 2003) ("Cruz's prior drug convictions do constitute some evidence suggesting a connection between Defendant property and illegal drug transaction. This evidence alone is insufficient to show a connection by

a preponderance of the evidence.")

In further support of its argument that there is a substantial connection between the defendant properties and narcotics activity, the government relies on admissible evidence suggesting that Young did not have sufficient legitimate income to afford the defendant properties. The government asks the court to infer the requisite connection to narcotics activity from this disparity. The court agrees that Young's deposition testimony – in which he asserted that his sole sources of income following his illegal reentry were renting his basement, buying and selling cars at very small profits, and an insurance payment he received a decade prior to his reentry – raises significant questions about how he was able to acquire and maintain the defendant properties. His assertion of the Fifth Amendment in response to a discovery request about his finances raises further questions about the sources of his income, especially considering that Young has not submitted any documentary evidence to support the claims he made during his deposition. See United States v. United States Currency in the Sum of $185,000 more or less, 455 F.Supp.2d 145, 150 (E.D.N.Y. 2006) ("A party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence.") (internal quotation marks and citation omitted). But while Young's unexplained income supports an inference of illegal activity, it does not support an inference of narcotics-related activity. See United States v. $31,990 in U.S. Currency, 982 F.2d 851, 854 (2d Cir. 1993) ("At best, the presence of a large amount of cash in the cab supports an inference of illegal activity but does not suggest that the seized currency was tied to the exchange of a controlled substance."); $248,430, 2004 U.S. Dist LEXIS 7072, at *14-*15 (finding large amount of cash seized from defendant with "self-proclaimed financial struggles" raises inference of illegal activity, not narcotics-related activity). Thus, standing alone, the questions raised by Young's unexplained income are insufficient to

establish, as a matter of law, the requisite substantial connection by a preponderance of the evidence.

Based on the admissible evidence in this case, there is a genuine issue of material fact as to whether the government has met its burden to show by a preponderance of the evidence that the defendant properties are subject to forfeiture. The government has not submitted sufficient admissible evidence to demonstrate a substantial connection between the defendant properties and narcotics activity as a matter of law. Nonetheless, a reasonable jury considering the admissible evidence could find such a connection. The unanswered questions regarding the source of Young's income considered in conjunction with Young's narcotics convictions could lead a reasonable jury to find that the requisite connection exists. But a reasonable jury could also reach the opposite conclusion. Thus, a genuine issue of material fact exists, and summary judgment is inappropriate. The cross-motions by the government and Young are denied.

## <u>CONCLUSION</u>

For the foregoing reasons, the court holds that (i) Young's October 13, 2005 arrest violated the Fourth Amendment to the United States Constitution, (ii) under the exclusionary rule, all evidence that is the fruit of Young's illegal arrest must be suppressed in this action, and (iii) considering only the admissible evidence, there is a genuine issue of material fact as to whether the government has met its burden to show that the defendant properties are subject to forfeiture.  The cross-motions for summary judgment by the government and Young are denied. SO ORDERED.

/s/ARR_____
Allyne R. Ross
United States District Judge

Dated:          March 31, 2011
                Brooklyn, New York